1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                        Plaintiff,<br>   v.<br><br>THOMAS FRANCO,<br><br>                      Defendant. | Case No. 2:16-cr-00308-HDM-PAL<br><br>**REPORT OF FINDINGS AND RECOMMENDATION**<br><br>(Mot Suppress Evid – ECF No. 23) |

Before the court is Defendant Thomas Franco's Motion to Suppress Evidence Due to Fourth Amendment Violations (ECF No. 23) which was referred to the undersigned for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4 of the Local Rules of Practice. The court has considered the motion, Franco's Notice of Manual Filing (ECF No. 24), the government's Opposition (ECF No. 33), Franco's Reply (ECF No. 38), and the testimony at the evidentiary hearing conducted February 14, 2017. Raquel Lazo and Heidi Ojeda appeared on behalf of Franco, and Phillip Smith appeared on behalf of the government.

## BACKGROUND

### I.    The Indictment

Defendant Thomas Franco ("Franco") is charged in an Indictment (ECF No. 1) returned November 1, 2016, with one count of felon in possession of firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment arises out of an arrest by officers of the Las Vegas Metropolitan Police Department ("LVMPD") on June 7, 2016, in a Wal-Mart parking lot. LVMPD officers observed a Honda Accord driving westbound on Lake Mead. Using binoculars, one of the officers observed the vehicle's license plate. A records check on the plates through the Nevada Department of Motor Vehicles showed a "no return". The driver pulled into the Wal-Mart parking lot and officers conducted a traffic stop of the vehicle in the parking lot. Franco was the driver of

1

the vehicle.  Officers investigated and eventually searched the vehicle finding bullets in a Crown Royal bag on the floor board and a gun in an empty center console area.  Officers determined that Franco was a convicted felon and arrested him for felon in possession of a firearm.

## II.    The Parties' Positions

### A.  Franco's Motion to Suppress

In this motion, Franco argues he was stopped without reasonable suspicion as he parked in the Wal-Mart parking lot.  Within a minute of the stop, he was physically removed from the vehicle, laid over the hood of the patrol car, handcuffed and frisked.  The motion argues that this constituted a de facto arrest without probable cause.  He seeks to suppress all physical tangible evidence as well as any incriminating statements arising out of the stop and arrest.  The motion maintains that LVMPD officers violated Franco's Fourth Amendment rights by seizing him without reasonable suspicion and arresting him without probable cause.  The motion also argues that Franco's Fourth Amendment rights were violated when officers illegally searched the Honda without a warrant, and without probable cause.

An officer's report justifies the search of the Honda as a "inventory search."  However, a tow was not called until almost four hours after the initial stop.  The motion anticipates the government's argument but disputes that police would have inevitably discovered the incriminatory contents of the vehicle in an inventory search.  The discovery indicates the vehicle Franco was driving had "cold plates," *i.e.*, the license plate did not belong to the vehicle.  The owner, Sarah Alley West ("Sarah" or "Ms. West"), eventually emerged from the Wal-Mart and admitted that she was the one who had placed the plates on the car.  Franco also disputes that the government will be able to prove a lawful inventory search occurred in furtherance of a community caretaking purpose.  Officers lacked a valid justification to impound the Honda under LVMPD policy, which only provides 12 circumstances that justify impoundment, none of which were present in this case.  A copy of the LVMPD impound policy is attached as Exhibit I to the motion.  Franco maintains that the Honda was lawfully parked in the parking lot of the Wal-Mart and was not impeding traffic, or threatening public safety or convenience where it was parked.  Under department policy, the officers should have left the car parked in the parking stall as they had no

legal right to impound it. Alternatively, the officers should have permitted the owner of the vehicle to drive it away. The officers' unconstitutional actions resulted in the recovery of bullets, a gun, and Franco's DNA, which the court should suppress as the fruit of an unlawful search and seizure.

## B. The Government's Opposition

The government opposes the motion arguing that the police report and body-cam videos attached as Exhibits A and B to defendant's motion establish that a traffic stop was conducted on a vehicle with fictitious plates in the Wal-Mart parking lot. Prior to the stop, police officers determined the vehicle had been "cold-plated". The driver of the vehicle began to get out before officers made contact with him. Franco was ordered out of the car, and as he stepped out of the car, a small metal item fell from his waistline and fell on the ground. This item was discovered to be a "shaved" key, an item commonly used to steal vehicles. As a result, Franco was immediately detained. After receiving *Miranda* warnings, Franco claimed he had no knowledge of the fictitious plates, and that he had given a ride to his friend, Sarah, who was inside the Wal-Mart store shopping. Franco told the officers the vehicle was hers.

The government acknowledges that Sarah subsequently came out of the Wal-Mart and told officers that Franco had given her a ride, and that she had placed fictitious plates on the car to avoid being stopped. However, while obtaining the Vehicle Identification Number ("VIN"), an officer noted that the steering column had been tampered with, and the center console was missing the stereo component, which were indications of a stolen vehicle. A records check of the VIN showed that the license plate associated with the vehicle had been suspended, and was different than the one that was on the vehicle. Because of the vehicle's "questionable status" about who had rightful possession and/or ownership, and the fact that the vehicle could not lawfully be driven on public roadways, the officers decided to have it towed.

The government claims that the police located a small bag containing pistol ammunition on the passenger side floorboard, and a loaded Ruger 9mm semi-automatic handgun inside the center console area where the stereo should have been. Sarah was questioned and denied that the handgun belonged to her. The firearm was recovered pursuant to a state telephonic search warrant. The LVMPD crime laboratory later issued a report indicating that the defendant's DNA was on

the holster which contained the firearm.  Additionally, on June 14, 2016, Franco allegedly told somebody in a recorded jail phone call that he "got caught with a burner," a term commonly used for a firearm.

The government argues that officers had reasonable suspicion to immediately detain Franco and developed probable cause to arrest him.  The collective knowledge of all officers involved in a criminal investigation may be considered to determine if a detention or arrest complies with the Fourth Amendment.  Here, the police had at least reasonable suspicion to believe a crime had been, was being, or was about to be committed by Franco when they determined that he was driving a "cold-plated" vehicle, in violation of Nevada traffic laws.  A cold-plated vehicle is often used in the commission of crimes to avoid police detection or apprehension.  It was, therefore, clearly reasonable for the police to immediately detain Franco to investigate his per se illegal operation of a motor vehicle and attempt to determine whether or not the vehicle was stolen or Franco had been or was about to be involved in criminal activity.

When the defendant stepped out of the vehicle, he dropped a shaved key from his person, which was another indication of a possibly stolen vehicle and a possible possession of burglary tool under Nevada law.  This justified his continued detention and provided probable cause for his arrest independent of the traffic law violation.  During the course of the investigation, an officer noticed that the steering column of the vehicle had been damaged, another indication the vehicle was possibly stolen.  A records check indicated Franco had been previously convicted of a crime involving a stolen automobile, and officers were aware that the vehicle Franco was driving, a 1996 Honda Accord, is a vehicle type that is frequently stolen.  Although police determined the vehicle had not been reported stolen, that did not necessarily mean that the vehicle had not been stolen, or that Franco and/or Sarah rightfully possessed it.

The government disputes that immediately ordering Franco out of the vehicle turned his original detention into a de facto arrest, or one that was constitutionally impermissible.  The government contends that the fact that Franco may have been immediately handcuffed when he got out of the vehicle did not convert the investigatory detention into an arrest.  The government maintains that the investigation developed probable cause to arrest Franco for possession of the

firearm.  Assuming arguendo that discovery of the firearm was the only basis for the arrest, which the government disputes, "an arrest would only require the police to have sufficient cause to believe that the Defendant was in actual or constructive possession of a firearm."  In this case, the firearm was found inside a center console area of a vehicle Franco was driving.  Based on the location of the firearm in the vehicle, the fact that Sarah stated the firearm did not belong to her, and the officers' knowledge that Franco had previously been convicted on multiple occasions of felonies involving possession of firearms, there was probable cause to arrest him for the offense of felon in possession of a firearm.

Additionally, the government disputes that Franco has standing to challenge the search of the vehicle.  As the proponent of a motion to suppress, he has the burden of establishing that his Fourth Amendment rights were violated by the challenged search or seizure and may not vicariously assert violation of another person's Fourth Amendment rights.  In this case, Franco does not contend that he was the owner of the vehicle, or that the firearm was located in a private area of the vehicle where he had a legitimate expectation of privacy.  Rather, he claims only that he was driving a car with the permission of its lawful owner, Sarah, and thus had a reasonable expectation of privacy in the car.  The government argues Franco could not have a legitimate expectation of privacy in an exposed center console area of a vehicle that is being operated illegally on a public roadway with another individual inside the car.  The motion does not claim that Sarah allowed Franco to borrow the car and exclude anyone else from it while he was in possession, only that Sarah asked him to drive her to the store in someone else's vehicle.  The motion does not establish that Sarah was the rightful owner of the vehicle, or that Sarah was able to legitimately give Franco permission to drive it in the first place.

Finally, the government argues that even if Franco has standing to challenge the search of the vehicle, the search of the vehicle was lawful as an inventory search pursuant to LVMPD policy.  This is because police determined within minutes of the initial stop that the vehicle was going to be impounded pursuant to LVMPD policy because it was cold-plated, the true license plates and registration for the vehicle had been suspended, and the vehicle could not legally operate on public roadways.  Section 5/204.06(10) of the LVMPD policy manual allows for impoundment under

these circumstances. The government also maintains the police had a substantial basis to believe the vehicle was stolen or not in the rightful possession of Franco and/or Sarah because: the vehicle was cold-plated; the vehicle had a damaged steering column; Franco possessed a shaved key; Franco had multiple prior felony convictions involving stolen vehicles and/or grand larceny; the vehicle itself is one that is commonly stolen; Sarah had no proof of ownership of the vehicle; and the registered owner of the vehicle lived in another state and was unable to be contacted after more than one attempt. The vehicle was therefore subject to impoundment under Section 5/204.06(6) of LVMPD's policy manual, which allows for an impoundment when ownership and rightful possession by the driver is in doubt.

The government argues in the alternative, that if the court finds that the police "jumped the gun" and began searching the vehicle before they actually decided to tow it, or had a reasonable basis to tow it, the firearm would have been inevitably discovered. The inevitable discovery doctrine is an exception to the exclusionary rule and permits admission of otherwise excluded evidence if the government can prove that the evidence would have been obtained inevitably regardless of any police overreaching. In this case, by following routine procedures, the police would have inevitably uncovered the evidence. Here, it is more likely than not that by following routine police procedure, the vehicle would have been lawfully impounded and inventoried, and the firearm would have been discovered during the course of the inventory. The government disputes that Sarah should have been permitted to drive the vehicle away, because it was unlawful for the vehicle to be driven without a valid license plate when its true registration was suspended.

**C. Franco's Reply**

Franco's reply argues that the government's opposition makes a number of unsupported representations. Franco's motion did not acknowledge that the vehicle's registration had been suspended. Franco argues that, although officers indicated the license plate on the Honda Accord was suspended, license plates can show up as suspended due to clerical errors with the DMV database. Franco also disputes that officers saw a "shaved" key fall from Franco as he got out of the car. Discovery provided by the government shows the officers found a shaved key on the ground after Franco's arrest and after Officer Hager searched the car. The police property report

indicates police found the shaved key while executing the search warrant several hours later. Additionally, no body camera footage produced to the defense shows any officers seeing, identifying, or discussing the "shaved" key.

The reply also points out that none of the police reports produced in discovery support the government's claim that, while obtaining the VIN, an officer noticed the steering column had been tampered with, and the center console was missing the stereo component. Officer Hager's body camera shows he obtained the VIN from outside of the Honda and walked away. Three minutes later, Hager walked back to the Honda, opened the door, and began rummaging through the car's contents. Within seconds of being stopped, Franco told officers he had no knowledge about the fictitious plates on the vehicle, and that he was giving a ride to his friend, Sarah, who was inside of the Wal-Mart. The reply argues that the government's opposition contains post-arrest details about a jail call and Franco's DNA not relevant to the motion to suppress. An unlawful search may not be validated by what it turns up. The reply also reiterates arguments that police unlawfully seized Franco without reasonable suspicion and made a de facto arrest without probable cause. The court must determine the collective knowledge of the officers at the time of the seizure, not whether officers eventually had sufficient collective knowledge to make an arrest.

Franco disputes that the officers had reasonable suspicion to stop Franco for a fictitious plates violation under Nevada law. Assuming the plates were "fictitious," Subsection 1 requires the car to be operated upon a highway. Here, the vehicle was stopped in a Wal-Mart parking lot. Additionally, Subsections 2 and 6 of NRS 482.545 require a "knowing" element about the fictitious plates. Franco consistently denied he knew the plates were fictitious, and Sarah admitted she placed the plates on the car to avoid being stopped.

Courts examine the totality of the circumstances in deciding whether an investigative detention has ripened into arrest, focusing on the perspective of the person seized, rather than the subjective beliefs of law enforcement officers. In this case the officers conducted a de facto arrest by laying Mr. Franco over the hood of the patrol car, handcuffing him, and searching under his clothes. This was done within seconds of the stop. A reasonable innocent person in Franco's position would understand that he was under arrest.

Thy reply acknowledges that Franco must have standing to challenge the search of the vehicle. However, citing *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005), Franco argues that an individual's conduct may establish a subjective expectation of privacy that society is prepared to accept as reasonable. A driver who does not own a car may exhibit an objectively reasonable expectation of privacy sufficient to establish standing. The reply cites *United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980) for the proposition that a non-owner who has both the permission to use a friend's automobile and the keys to the ignition and trunk, with which he could exclude all others except his friend, possesses the requisite legitimate expectation of privacy necessary to challenge a search of the car. The right to exclude others is a factor for the court to consider, but "it is neither exclusive nor determinative standing alone." Franco cites *United States v. Thomas*, 447 F.3d 1191, 1199 (9th Cir. 2006), for the proposition that even an unauthorized driver can have a possessory or ownership interest sufficient to challenge an unlawful search of a car. In this case, Franco had both the permission to use his friend's automobile and the keys to the ignition and trunk. Thus, he had the requisite legitimate expectation of privacy necessary to challenge the propriety of the search of the Honda Accord.

The reply also reiterates arguments that, at the time Officer Hager conducted a search of the vehicle, there was no community caretaking function that justified an impound of the vehicle. An inventory search cannot be used as ruse for general rummaging to discover incriminating evidence. Police may only impound and search a vehicle under the "community caretaking" doctrine: (1) in furtherance of a community caretaking purpose such as promoting public safety and efficient flow of traffic, and (2) in conformance with the standardized procedures of the local police department. A decision to impound a vehicle that is not consistent with law enforcement's role as "caretaker of the streets" is unreasonable. Neither of the two justifications articulated by the government for this impoundment satisfy the standard. The Honda Accord was lawfully parked in the parking lot of Wal-Mart. The car was not impeding traffic or threatening public safety or convenience where it was parked. Therefore, government cannot prove the impoundment was done pursuant to LVMPD policy.

/ / /

LVMPD policy 5/204.06(10) states that an impoundment may be proper "[i]n other circumstances, in accordance with the prescribed authority and conditions defined in the Las Vegas City Code, Clark County Ordinances, and Nevada Revised Statutes." However, the government points to no authority under Las Vegas City Code, Clark County Ordinances, or Nevada Revised Statutes that would authorize the police tow on this vehicle from private property. Similarly, the government cannot rely on LVMPD policy 5/204.06(6) that authorizes an impound when ownership and rightful possession by the driver is in doubt. At the time of the search in this case, there was no doubt about Franco's identity, and Franco's statements about the car's owner and her whereabouts. If police doubted his statements, their doubts could not justify an impound within minutes of the stop because the police were still running the VIN and trying to determine who the registered owner was. Here, Officer Hager began to search the vehicle before the officers knew anything about the car's license and registration. At the time Hager opened the passenger side of the vehicle, police knew only that the car's plates showed "no return," Franco had felony priors in the past, and the owner was inside the Wal-Mart and would soon return. Police had no information about the damaged steering column, any shaved keys, that Sarah had no proof of ownership of the vehicle, or that the registered owner of the vehicle lived in another state and was unable to be contacted. No attempt had been made to contact the registered owner. In short, Franco argues that the government cannot use later-learned facts to justify Officer Hager's search, and that the impound search exception was not justified under the Fourth Amendment.

Franco also maintains that the police unreasonably ignored information that dissipated probable cause for Franco's continued arrest. Citing *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007), Franco argues that although the police may initially have had probable cause to justify an arrest, if additional information obtained at the scene indicates there is less than a fair probability that the defendant has committed or is committing an offense, the continued arrest of the person is illegal. Police may not disregard facts tending to dissipate probable cause. In this case, within five minutes of the search, police learned information that dissipated probable cause that Franco had committed any crime because minutes after searching the car and finding the gun, officers knew the car was not stolen. Additionally, Ms. West emerged from the Wal-Mart and

9

admitted to "cold plating" the car to avoid being stopped. Police became aware that the registered owner of the car had a concealed weapon permit and had recently possessed the car. Franco was cooperative with officers and followed their orders. Franco truthfully identified himself and answered the officer's questions. Ms. West confirmed the veracity of Mr. Franco's statement. Franco denied knowledge about "cold plating" and denied knowledge about the gun. Despite all of these facts, which dissipated probable cause, officers continued to keep Franco under arrest in violation of his Fourth Amendment rights.

Finally, the reply reiterates arguments that because the impoundment was not justified, the inevitable discovery doctrine does not apply. In this case, Officer Hager opened the door and began searching its contents before police had even determined the identity of the car's registered owner. The only reason finding the firearm was inevitable was because the officer took a shortcut. Shortcuts do not justify unlawful searches, and later-learned facts do not justify a search unlawful from its inception. The police violated Franco's constitutional rights and as a result, the bullets, gun, and Franco's DNA should all be suppressed as the fruit of an unlawful seizure and search.

## III.    Testimony at the Evidentiary Hearing

### A. Officer Michael Donovan

Officer Donovan has been employed by LVMPD for almost nine years and works patrol. On June 7, 2016, he was on duty with Officer Abel in the northwest area command near Lake Mead and Jones. Abel was working on another call. Donovan observed an older model Honda driving northbound on Lake Mead. Donovan used binoculars to observe the license plate on the vehicle. Older model Hondas are vehicles that are easily and frequently stolen. He ran the license plate, which "didn't come back to anything." He reviewed his police report and refreshed his recollection that the license plates on the vehicle were Nevada plates. A no return report indicates there was no information on the plates, they were old, or the vehicle was "cold-plated." He decided to go after the vehicle and investigate. The fact that the license plate on the vehicle was a "no return" heightened his suspicion that the car may be stolen because cold-plating is a common tactic used to steal vehicles. The Honda pulled into the Wal-Mart parking lot. The officers got behind it and initiated a traffic stop in the parking stall in the Wal-Mart parking lot. Donovan reported

the call on his radio as a cold-plated vehicle.  As soon as the officers got there, Franco got out of the vehicle.  He was ordered back into the vehicle, and then ordered out.  Donovan placed him in handcuffs and set him on the curb.  Donovan identified the driver of the vehicle as Defendant Franco in open court.  As Franco got out of the vehicle, a small metal object fell out, which looked like a makeshift key or shaved key with tape wrapped around it.  This was another indication the Honda may be a stolen vehicle.

Officer Abel stayed with Franco while Donovan did a safety sweep of the vehicle to see if anyone else was in the vehicle.  During the sweep he observed the shaved key on the floor.  The driver was identified and a records check was conducted.  The records indicated Franco had prior felony convictions for weapons offenses and possession of a stolen vehicle, which contributed to Donovan's suspicion a crime had occurred.  Donovan testified this is your "basic stolen vehicle" scenario.  He observed a shaved key, an older model Honda which is a frequently stolen vehicle, a suspect with priors for possession of stolen vehicle, and a cold-plated vehicle.  Donovan went to get the VIN to gather further information to determine whether the vehicle was stolen.  He looked inside the car while obtaining the VIN and saw that the steering column looked like it had been tampered with, which is another common way to steal a vehicle.  The registration on the vehicle was not current.  The registered owner, Thomas Alley, was out of Arizona.  A female came out of the Wal-Mart and said she was the owner.  The female, Sarah, said Thomas Alley was her father and gave the officers her father's number.  She also stated that the officers could find proof she owned the vehicle from paperwork in her house.  Donovan sent another officer to her house to attempt to locate the paperwork.

The decision was made to tow the vehicle because officers believed it was likely stolen, and "we weren't going to leave it in the parking lot."  Exhibit 1, LVMPD's vehicle impound policy, was admitted.  The policy allows a vehicle to be impounded when the ownership or rightful possession of a vehicle is in doubt.  The ownership and rightful possession of this vehicle was in doubt because the vehicle was cold-plated, the ignition had been tampered with, shaved keys were observed, and Franco had priors for possession of a stolen vehicle.  The police attempted to contact the registered owner without success.

Exhibit 2 was admitted.  It is the vehicle impound report for this case.  A shaved key is a possible burglary tool.  A copy of the Nevada Revised Statute ("NRS") prohibiting possession of burglary tools was admitted in evidence as Exhibit 3.  Exhibit 4 was admitted in evidence.  It is the NRS statute prohibiting driving with fictitious or false plates.

Donovan believed he had probable cause to arrest Franco for possession of burglary tools and for driving a vehicle with false and fictitious plates.  Donovan did not participate in the inventory of the vehicle.  However, outside the vehicle he observed the steering column had been tampered with.  He also saw that in the area of the center console there was a cavity where a stereo would normally be.

Vehicles are routinely towed by LVMPD officers when they are cold-plated and not in the custody of the registered owner.  The fact that the registered owner was out of state made it more difficult to contact him.  Officers need to use teletypes to obtain information from another jurisdiction which is one of the reasons the vehicle is typically towed.

The "CAD" (computer assisted dispatch) log was admitted as Exhibit 5.  It relates that at 10:57:46, an officer went to Sarah's address to attempt to verify her claim of ownership.  A later entry establishes officers tried to reach the registered owner in Arizona.  The registered owner was not reached and the vehicle was ultimately impounded.  The decision that the vehicle might be stolen and should be towed was made within the first 15 minutes of the stop.  The registered owner was out of state and "all other elements present" made Donovan suspicious the vehicle was stolen.

On cross-examination, Donovan testified that, at the time of the stop, he had been patrolling the northwest area command for approximately six months.  He and Abel were on another stop when Donovan first saw the vehicle through binoculars.  He did not notice anyone in the vehicle other than the driver.  Abel was having a conversation with two people in the shade when Donovan made his observations.  Donovan ran the vehicle after seeing plates through the binoculars.  The vehicle was a mid-90s Honda; which in and of itself was not suspicious.  However, the records check came back as a "no return."  He and Abel finished the other stop.  Donovan never lost sight of the Honda and followed it into the Wal-Mart parking lot.  Donovan did not have any other information the vehicle was stolen, had warrants, or information on the driver.  Donovan did not

observe any other traffic violations other than the cold plates on the vehicle. Donovan also found it suspicious that the driver pulled around three places in the parking lot before parking. The police report refers to the vehicle driving between parking spots.

Wal-Mart is a private parking lot and the driver pulled into a parking spot. Defendant's Exhibit A was admitted. It is a picture of the patrol vehicle and the Honda officers pulled over. The vehicle was not impeding traffic or threatening public safety.

As Franco got out, Donovan saw something fall from his person. Officer Abel was wearing a body-cam. Exhibit G, Abel's body-cam video, was admitted in evidence. Portions of the body-cam video were played in open court. Officers initially told Franco to stay in the car and then ordered him out. Donovan acknowledged that the video did not depict something falling from Franco's person. Donovan described himself as "active" and trying to stay with Abel. The video depicts Franco with a cigarette. Donovan remembered seeing something metal fall from Franco, but wasn't initially suspicious when he saw the item fall.

The stop was called in as a possible stolen vehicle, Code 411. Donovan did not go inside the vehicle, but made observations in plain view. He obtained the VIN number and observed the steering column. Donovan did not recall if he told Abel about seeing the shaved key, but told everyone about it over the radio. It is likely he would have told Abel about his observations about a shaved key and his steering column observations. He broadcast a suspicious and likely stolen vehicle, but did not broadcast anything about a shaved key and the steering column over the air. He recovered the shaved key. He did not recall when, but testified it was probably before the vehicle inventory.

Exhibit B is the property report for the stop that Abel prepared. It notes that shaved keys were on a ring and a bent piece of metal with black tape was recovered from the Honda.

The gun was found in the execution of the search warrant. The CAD report indicates the tow truck arrived at 2:20 p.m. Donovan was the officer who applied for the search warrant. The telephonic search warrant the officer obtained was marked and admitted as Exhibit F. Donovan applied for the search warrant at 1:40 p.m.

/ / /

Donovan described Franco as cooperative. Abel initially commanded that Franco remain in the vehicle, then ordered him out. Franco was cooperative with Abel's command to show hands and placed his hands on the vehicle. Franco asked what was happening. Donovan could not recall whether Franco said the owner of the vehicle was in the Wal-Mart. Donovan did not recall who ran the VIN number on the computer, only that the VIN was obtained and it was done. The CAD report shows Officer Hager arrived at the scene approximately 10 minutes after the stop. Donovan and Abel were both doing what they could to identify the registered owner of the vehicle. Officers learned that the vehicle was not reported stolen approximately 11 minutes after the stop. Officer Abel tried to contact the registered owner, but was not able to do so.

Page 4 of Exhibit F, the application for the search warrant, indicates officers had gone inside the vehicle. The search warrant was sought to retrieve the gun. Donovan told the judge that Officer Abel had contacted Thomas Alley who told Abel that Sarah was permitted to have the car. Donovan could not recall how Abel was able to contact Thomas Alley in Arizona. He thought it was a "cop-to-cop favor." Sarah had something at her residence to show ownership of the vehicle. Donovan could not recall his conversation with Sarah. Specifically, he did not recall Sarah saying she cold-plated the vehicle, or that Franco had permission to use it.

When Donovan conducted a sweep of the vehicle, he did not go inside, he just looked inside for a person. Donovan could not recall whether he confronted Sarah about finding a gun in the car, or whether Sarah denied knowing about it.

Donovan reiterated that it is very rare when officers do not tow a cold-plated car. He found it suspicious that Franco had priors and, under the totality of the circumstances, decided the vehicle should be towed.

On redirect, Donovan testified that he ran the plates on the Honda at the beginning of the stop because the year and make of the car is a frequently stolen vehicle, and it was observed driving in an area where there are a lot of stolen vehicles. The CAD report shows an entry at 10:35:59 that officers were on a possible 411, stolen vehicle call, and "key is stripped in the ignition." Franco stated the owner of the vehicle was in Wal-Mart. Donovan had no reason to believe Franco as he had not seen anyone in the vehicle before the stop. The fact that the vehicle was not reported

stolen did not mean that it wasn't stolen.  Cold-plated cars are almost always towed because cold plates are placed on vehicles to hide stolen plates unless an owner takes off the plates on one vehicle and puts them on another.  LVMPD policy authorizes tows of cold-plated vehicles.

In response to questions by the court, Donovan testified that he had authority to make an arrest for driving a cold-plated vehicle or a vehicle with fictitious license plates.  However, in response to defense questioning, he acknowledged that he did not arrest Franco or Sarah for a cold plate violation.  Cold-plated vehicles are almost always towed, even in a private parking lot.  The vehicle could not have been left there because it would have violated policy.

### B.  Officer John Abel

Abel has been employed by LVMPD for 10 years.  On June 7, 2016, he was on another call with Officer Donovan at approximately 10:35 a.m., in the area of Lake Mead and Jones.  Donovan observed a Honda driving westbound on Lake Mead while Abel was on another stop across the street.  Donovan was using binoculars when he observed the Honda, and ran the plates finding the plates did not come back to the vehicle.  The officers went to make a stop.  As soon as the patrol car pulled behind the vehicle in the parking lot, the driver immediately got out.  He was taken into custody.  Older model Hondas are stolen "a bunch."  The plate was considered a cold plate.  In that area of town, there is a high probability that a car will come up stolen.  When the driver got out of the car, Abel saw something fall out of his lap.  He checked and observed a shaved key.  A VIN check was done that indicated the vehicle was not reported stolen.  The registered owner was an older gentleman whose name Abel could not recall.  The vehicle was registered in Arizona.  A records check of the driver, Defendant Franco, indicated he had a criminal history for grand larceny auto or possession of stolen vehicle.

Abel attempted to contact the registered owner of the vehicle.  Franco was placed into custody and read *Miranda* warnings.  Franco stated that the car belonged to a female, Sarah, that he had dropped off.  Sarah came out of the Wal-Mart within a few minutes and stated the car belonged to her dad.  Sarah also stated she placed plates that didn't belong on the vehicle because she could not afford to have it registered.  Portions of Abel's body-cam video were played in open court.  Approximately 12:22 minutes into the stop, Sarah is heard stating her dad's name is Tom.

1    Abel told Sarah he was "not looking at you" and requested that Sarah call her father.  Sarah

2    attempted to reach her father on the phone, and stated he was not answering.  Abel asked Sarah

3    why she was crying.  At 25 minutes into the stop, Abel left a message for Mr. Alley indicating he

4    was calling about a Honda and attempting to verify ownership.  Abel was attempting to reach the

5    registered owner because he did not know whether Sarah had the right to possess it.  Abel could

6    not recall Sarah saying the vehicle had been stolen before.  However, when the video was played,

7    it refreshed his recollection.  Sarah stated she knew Franco from her brother, and that he was a

8    friend.

9            The decision was made to tow the vehicle.  Abel did not recall who did the impound report.

10   Abel observed a firearm in the center console during completion of the inventory.

11           On cross-examination, Abel testified that at the time of the stop, he only knew the car was

12   cold-plated.  There was nothing suspicious about the driver, and he did not know anything about

13   the driver.  Abel lost sight of the driver before the stop.  The driver could have dropped off a

14   passenger.  Abel did not recall if the officers activated their lights to make the stop.  The car was

15   not obstructing traffic in the parking lot.  As Abel was getting out of the patrol car, the driver was

16   already getting out.  Franco was compliant for the most part.  He was immediately placed in

17   handcuffs.  During a pat down, Abel went into Franco's right pocket and pulled out a wallet.  He

18   also went into the left pocket.  After obtaining Franco's identification, Abel did a records check

19   and learned that Franco had felony convictions.

20           Several officers arrived at the scene including Officers Ostrovsky and Hager.  The body-

21   cam video shows that 7:45 minutes into the stop, Hager got the VIN from the car.  At this point,

22   Abel had not been to the vehicle.  However, he knew something fell from Franco as he got out of

23   the car.  It was a long piece of metal with a piece of tape on it.  Abel did not pick the item up

24   because he was focused on Franco.  He did not recall whether Franco had a cigarette.  The decision

25   to tow the vehicle was pretty much made after the stop.  From the VIN, officers figured out that

26   the car did not belong to Franco, and that it was cold plated.  The body-cam video shows that

27   between 10 and 11 minutes into the stop, officers determined the car was not registered in

28   California.  An officer states "try Arizona" and a report came back that the car was from Arizona

1   and had suspended plates.  However, the report was negative for a stolen vehicle.  Eleven minutes

2   after the stop, Officer Hager is observed inside the Honda while Donovan is at the front of the

3   patrol car.  Abel did not ask Hager to go inside the vehicle.

4          The registration came back to Thomas Alley.  Even though officers learned the vehicle was

5   not reported stolen, this does not mean the vehicle was not stolen.  Abel learned that Hager found

6   rounds and then a gun inside the vehicle.  Then Abel went to the Honda and Hager showed him

7   where the gun was.  A little after 13 minutes into the stop, the gun was discovered.  The gun was

8   inside a holster, inside the center console area where the radio used to be.  When asked whether

9   the gun was hidden, Abel responded it was not in plain view, and that someone would have to be

10  in the car to see where it was.

11         Abel talked to the female who approached the car separate from Franco and told her

12  officers found a gun in the car.  Abel did not recall whether Sarah indicated she had title to the

13  vehicle at home, but saw a CAD printout indicating an officer was sent to a residence to attempt

14  to locate the title.  Approximately 15 minutes after the stop, Sarah is heard on the video stating

15  that the car is hers, rather her father's, Thomas Alley, which was consistent with the information

16  received concerning the registered owner.  Sarah attempted to reach her father and Abel left a

17  message on her father's voicemail.  At some point, Abel had a conversation with Mr. Alley "after

18  it was all said and done."  Sarah said she was in the vehicle and Franco had dropped her off.

19         After the gun was found the vehicle was "frozen" and officers waited for a search warrant.

20  Then Abel did an inventory of the vehicle.  The inventory report reflects that clothing was found.

21  He did not recall whether it was male or female clothing.

22         Franco was not arrested for the cold plate violation because officers are not permitted to

23  stack charges.

24         Abel recalled someone saying that Thomas Alley owned firearms.  Abel probably ran Alley

25  and found he had a concealed weapons permit.  Franco adamantly denied the gun belonged to him.

26  Franco called Sarah a "square."  This prompted Abel to tell Sarah that "if the gun was hers, fine,"

27  to give her the opportunity to say the gun was hers.  Although a records check indicated she had a

28  prior for battery, she could still lawfully own a firearm.

Abel believed that Hager stated the bullets were found on the floorboard of the vehicle in a purple baggie. Sarah's purse was searched. A second disk of the body-cam video was marked and admitted as Exhibit H. The video shows that Sarah's purse was searched and a purple bag was retrieved from it. One of the officers made a comment "there's another one." There were two purple bags found, one on the floorboard and one in Sarah's purse.

Anytime there is a question about ownership of a vehicle, it is inventoried. Here, the registered owner was not at the stop, the vehicle was cold plated, and officers could not confirm whether it was stolen or not. The tow was requested about four hours after the initial stop. Abel acknowledged that Exhibit 2, the impound report, was left blank in the portion of the form asking for the reason for the impound. Abel testified that this was a mistake and he simply forgot to mark the form. Had he done so, he would have said the impound occurred because the driver was arrested. Abel testified the officers could not have left the vehicle parked in the parking lot because there was still a question about whether it was actually reported stolen. A car does not need to be obstructing traffic to be towed.

Sarah walking out changed things. However, the officers still had to confirm the vehicle was not stolen. The decision to impound the vehicle "could have been unmade" if everything had checked out.

On redirect, Abel testified that Nevada law authorizes an arrest for operating a vehicle with cold plates. Abel knew the driver was driving a cold-plated vehicle before he made contact with Franco. Abel could have seen the firearm if he sat in the driver's seat of the vehicle. The body-cam video indicates officers learned Franco was a "10-time felon." Donovan's report reflects Franco's prior convictions included felon in possession of a firearm, which also added to probable cause for Franco's arrest.

**C. Officer David Hager**

Hager testified that he was involved in the investigation of a cold-plated, possibly stolen vehicle in this case. He testified on direct that he was informed a suspect was at the scene and was a 10-time convicted felon. He was wearing a body-cam, and his body-cam video was admitted as

/ / /

18

defendant's Exhibit I.[1]  27:35 minutes into his body-cam video, a woman is heard asking why police thought the vehicle was stolen.  Hager responded, "because the key is shaved and that's not normal.  Parked cars don't normally have center consoles missing, and this car looks like it's stolen."  Hager was the officer who went into the vehicle and observed the firearm.  He did not recall if an inventory search was done by another officer.

On cross-examination, Hager testified he arrived in the Wal-Mart parking lot after patrol was already there.  The officers making the stop were trying to figure out what the deal was with the car and suspected it was cold plated.  The VIN had not yet been run.  Officer Abel asked Hager to check the VIN number.  Franco was asked if he had any paperwork in the vehicle that might help.  Portions of the video were played, and at 6:20 into Hager's body-cam video, Hager is heard asking where the female who owned the vehicle was at, and Franco responded that she was in the Wal-Mart.  At 7:02 into the body-cam, Hager entered the vehicle.  He stated it was to find paperwork on the car because he had been told the female owned the car.  At 7:22 on the body-cam, Hager picked up a purple baggie.  Hager acknowledged he was not looking for paperwork concerning ownership of the vehicle, "just searching."  He opened the bag finding bullets and asked Franco where the gun was.  At 8:29 on Hager's body-cam shows Hager had moved from the passenger side to the driver's side of the vehicle and was looking under the driver's side seat.  Hager testified he was trying to adjust the seat and was looking for a gun for officer safety.  At 9:42 on Hager's body-cam, Hager is seen on the passenger side and heard stating "hey bro, 413 right in the center."  The gun was found right in the middle of the empty console area.

On re-direct, Hager testified that a 413 is code for a gun.  It was found right in the middle of the vehicle, not hard to find, and he "didn't have to dig" to find it.

**D.  Sarah Alley West**

At the conclusion of Officer Hager's testimony, the government rested.  The defense called Sarah Alley West.  Ms. West testified that on June 7, 2016, she was with Thomas Franco.  She knew Franco and regarded him as a friend or an acquaintance she met through her brother-in-law.

---

[1]  Throughout his testimony, Hager was reluctant to answer questions without first reviewing the video footage, and repeatedly asked to have the video played before he answered questions on cross examination.

They were together that day in her car. Franco was the driver. She gave Franco permission to drive. Sarah testified that the car is titled in her father's name, but that it was her vehicle. Her father is Thomas Alley. The vehicle she owned was a 1996 Honda Accord. The vehicle was in her father's name because she was going through a divorce and did not want her husband to get the car in the divorce. Exhibit A is a photograph of her Honda.

Before traveling to the Wal-Mart, the vehicle had been sitting in the driveway unlocked. She could not recall if Franco had clothing or a backpack inside the vehicle. It was possible, but she did not recall. When shown Exhibit D, a photo of the interior contents of the Honda, and asked whether the backpack was hers, she testified that it was not her backpack and was "possibly his." The clothing shown in the picture is not hers.

On June 7, 2016, she told officers that it was her vehicle. She believed that the officers had her call her father. At the time of her testimony, she was in custody for a matter unrelated to this traffic stop. She was arrested about a month later on another charge.

On cross-examination, West testified that she was in custody on a probation violation. She was serving months on her first possession of burglary tools and possession of false identification documents in July. She acknowledged that possession of false identification documents is a crime involving dishonesty.

Ms. West bought the car off of Craig's List and had it for approximately eight to nine months before this stop. The registered owner was her father. Her father was the registered owner because she did not want to lose the car in her divorce. She admitted that she cold plated the vehicle. She testified that she put fake plates on the car because she didn't have a plate for the vehicle. On June 7, 2016, she was going to the Wal-Mart from her house. Franco was driving because he complained when she drove. When asked whether she ever told Franco he had the right to prevent others from accessing the vehicle, West paused and ultimately said, "yeah." At first, Sarah testified that Franco did not have permission to store things in her vehicle. However, she testified "he could have his stuff" in the vehicle. It wasn't discussed. She recalled that the center console area of the vehicle was missing the stereo. During the stop she learned that a gun had been recovered.

On re-direct, Sarah testified this was not the first time that Franco had driven or used the car. He had used the car "a lot" before this stop.

At the conclusion of Ms. West's testimony, the defense rested. The court canvassed Mr. Franco about whether he understood that he had the right to testify or not at the evidentiary hearing. Franco confirmed that he had discussed the matter with his counsel, understood that he had the right to testify or not, and that after conferring with counsel, it was his decision not to testify.

## DISCUSSION

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347, 350–51 (1967). The Fourth Amendment protects "people, not places." *Id.* at 351. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963); *United States v. Lundin*, 817 F.3d 1151, 1157 (9th Cir. 2016); *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) ("Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule.") (citing *Wong Sun*, 371 U.S. at 484–87).

### I.    Standing or Capacity to Challenge a Search

Fourth Amendment rights are personal rights and may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978); *United States v. Wei Seng Phua*, 100 F. Supp. 3d 1040, 1055 (D. Nev. 2015). When a person has no ownership interest in the place or thing searched, he must have a reasonable expectation of privacy to claim a violation of his Fourth Amendment rights. *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1187 (9th Cir. 2015) (finding that five people who did not assert ownership interests in the places searched were forced to rely on *Katz*'s reasonable expectation of privacy framework).

In *Rakas*, the Supreme Court rejected the notion that "any criminal defendant at whom a search was 'directed' would have standing to contest the legality of that search and object to the

admission at trial of evidence obtained as a result of the search." *Id.* at 132–33.  Rather, the "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* at 143.  A person charged with a possessory offense has no "automatic standing" to claim protection under the Fourth Amendment. *United States v. Salvucci*, 448 U.S. 83, 85 (1980) (overruling *Jones v. United States*, 362 U.S. 257 (1960), and holding "defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated").

The Supreme Court has enunciated a two-part test to determine whether an expectation of privacy is reasonable and legitimate.  *Katz*, 389 U.S. at 361.  First, the individual must have an actual subjective expectation of privacy, and second, society must recognize that expectation as objectively reasonable.  *Id.*  To say a defendant lacks Fourth Amendment standing is to say that "*his* reasonable expectation of privacy has not been infringed."  *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 695 (9th Cir. 2009) (citing *United States v. Taketa*, 923 F.2d 665, 669 (9th Cir. 1991)).  The defendant bears the burden of establishing, under the totality of the circumstances, that the search violated his legitimate expectation of privacy in the place searched or the things seized.  *Rakas*, 439 U.S. at 143; *United States v. Davis*, 332 F.3d 1163, 1167 (9th Cir. 2003).

The Ninth Circuit has recognized a non-exhaustive list of factors generally relevant in determining standing: (1) whether the defendant has a property or possessory interest in the thing seized or the place searched; (2) whether he has the right to exclude others from the place searched or items seized; (3) whether he has shown a subjective expectation in privacy that it would remain free from governmental intrusion; (4) whether he took normal precautions to maintain privacy; and (5) whether he was legitimately on the searched premises or legitimately in possession of the thing seized.  *United States v. Lopez-Cruz*, 730 F 3d 803, 807 (9th Cir. 2013) (citing *United States v Finley*, 477 F 3d 250, 258–59 (5th Cir. 2007)).  A defendant's failure to allege ownership of items seized is a factor to be considered in determining whether he had a reasonable expectation of privacy, but cannot, by itself, defeat standing to challenge a search. *United States v Sarkisian*,

197 F 3d 966, 987 (9th Cir. 1999). A possessory or ownership interest sufficient to create a reasonable expectation of privacy may be shown by understandings that are recognized and permitted by society. *United States v Thomas*, 447 F 3d 1191, 1198 (9th Cir. 2006). A defendant who lacks an ownership interest has standing to contest a search of a friend's car if he shows "joint control" or "common authority." *Id*. A non-owner driver of a privately owned car has standing to challenge a search where he has permission to use a friend's automobile, keys to the ignition and the trunk, and the ability to exclude all others except the owner. *United States v. Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980).

Here, it is undisputed that Franco was a non-owner driver of the 1996 Honda Accord at the time of the traffic stop. Sarah testified that she was the owner of the vehicle and frequently gave Franco permission to drive it. On the date of his arrest, Franco drove West to the Wal-Mart store. West testified that Franco drove when they were together because he complained when she drove. He remained in the car while she went inside the Wal-Mart. Franco was in possession of the vehicle itself, had keys to the vehicle, was authorized to drive it, and was authorized to "keep his stuff" in it. Franco had the right to keep others from the car, except for West, and was legitimately in possession of the car. The gun was found in the center console area where the stereo used to be. It was not in plain view, indicating that Franco took normal precautions to maintain privacy. Under these circumstances the court finds Franco has met his burden of establishing he had a reasonable and legitimate expectation of privacy in the vehicle and its contents. Franco therefore has standing to challenge the search of the vehicle.

## II.    The Traffic Stop

The motion to suppress argues Franco was seized in a traffic stop while parked in the Wal-Mart parking lot without reasonable suspicion. A temporary detention of an individual during a traffic stop constitutes a seizure within the meaning of the Fourth Amendment. *Wren v. United States*, 517 U.S. 806, 809–10 (1996). Because a traffic stop for a suspected violation of law is a seizure of the vehicle's occupants, it "must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, --- U.S. ----, 135 S. Ct. 530, 536 (2014).

/ / /

23

The Fourth Amendment requires only reasonable suspicion to justify a traffic stop. *Id*.; *see also United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). Reasonable suspicion is defined as "a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Id.* (citing *Prado Navarette v. California*, --- U.S. ----, 134 S. Ct. 1683, 1687–88 (2014). The reasonable suspicion standard takes into account the totality of the circumstances. *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) ("the whole picture"). This standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

As long as there is an objectively reasonable basis to perform a traffic stop, the stop will be permitted by the Fourth Amendment. *Whren*, 517 U.S. at 813. Subjective intentions play no role in ordinary Fourth Amendment analysis. *Id*. The Supreme Court has been "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Id*. In *Whren*, a unanimous Supreme Court held that a traffic stop was reasonable under the Fourth Amendment where officers had probable cause to believe a traffic violation occurred, even if the ultimate charge was not related to the traffic stop. *Id.* at 808–09. As the Ninth Circuit has articulated its understanding of *Whren*, if officers have reasonable suspicion to conduct a traffic stop, it does not offend the Fourth Amendment even if the stop served some other purpose. *See United States v. Choudhry*, 461 F.3d. 1097, 1102 (9th Cir. 2006).

A traffic violation is sufficient to justify an investigatory stop even if (1) the violation was merely pretextual, *Whren*, 517 U.S. at 811–12; (2) the stop departed from the regular practice of a particular precinct, *id.* at 814–15; or (3) the violation was common and insignificant, *id.* at 818–19. If police have reasonable suspicion to believe a violation of a traffic code has occurred, the stop is reasonable under the Fourth Amendment and evidence recovered from a stop is admissible. *Choudhry*, 461 F.3d. at 1102.

It is undisputed that Franco was observed driving westbound on Lake Mead Boulevard on the date of his arrest. Officer Donovan used his binoculars to check the license plate while it was driving on Lake Mead. When he ran the plates through police records, the license plates returned

as "cold plated" or "no return" meaning the plates did not belong on the vehicle. It is undisputed that driving with fictitious license plates, or plates that do not belong on a vehicle, is a violation of Nevada traffic law. NRS 482.545 makes it unlawful for any person to operate, or an owner or operator to knowingly permit the operation on a highway, of a vehicle "which is not registered or does not have attached thereto and displayed thereon the number of plate or plates assigned thereto" by the Department of Motor Vehicles "for the current period of registration or calendar year…." The court finds the officers had reasonable suspicion to conduct a traffic stop to investigate the fictitious license plate violation.

### III.    Probable Cause for Arrest

The motion to suppress also argues that because Franco was immediately removed from the vehicle, laid over the hood of the patrol car, placed in handcuffs and frisked, he was arrested without probable cause. The government's opposition concedes that Franco was detained, but asserts officers had reasonable suspicion to conduct an investigatory detention that developed probable cause for his arrest.

To comply with the Fourth Amendment a warrantless arrest must be supported by probable cause. *Michigan v Summers*, 452 U.S. 692, 700 (1981). "Probable cause for an arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v Lopez*, 482 F 3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Probable cause is an objective standard, and the officers' subjective intention about the crime for which they thought they were arresting a defendant "is immaterial in judging whether their actions were reasonable for Fourth Amendment purposes." *Id.* Additionally, the officers' "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.*

In this case, Franco was taken into physical custody, placed in handcuffs, patted down and given *Miranda* warnings almost immediately after he was stopped and got out of the vehicle. He was ordered to sit on the sidewalk and clearly not free to leave at any point before he was transported to jail on the felon in possession of firearm charge nearly four hours later. Franco was

clearly seized for purposes of the Fourth Amendment.  His liberty was restrained and a reasonable innocent person in his position would not feel free to ignore the police presence and go about his business.  *See Florida v. Bostick*, 501 U.S. 429, 434 (1991).  The officers applied physical force and Franco submitted to their show of authority.  *See California v Hodari D.*, 499 U.S. 621, 626 (1991).

The court finds that, at the time of the initial stop, officers Donovan and Abel had reasonable suspicion to believe Franco was operating a cold plated vehicle, *i.e.*, a vehicle with license plates that did not belong to the vehicle.  Nevada law authorizes an arrest for driving a vehicle that is not registered or displaying plates assigned by DMV or operating with fictitious plates, or plates that have been "cancelled, revoked, suspended or altered."  NRS 482.545(1), (2).  The stop was called into dispatch at 10:35:10 as "poss cold plated no return on plate".  *See* CAD report, Government's Exhibit 5.

The court found the officers' testimony credible that when Franco got out of the vehicle they observed something fall from his person.  Donovan testified it was a makeshift key or shaved key with tape around it, another indication the vehicle may have been stolen.  The officers' uncontroverted testimony is that a shaved or stripped key is a common burglary tool.  Possession of tools commonly used for burglaries "under circumstances evincing an intent to use" it in the commission of a crime is a gross misdemeanor under Nevada law.  NRS 205.080.  Within moments of the stop, dispatch was advised at 10:35:59 of a "poss 411 [stolen vehicle] … Key is stripped in the ignition." *Id.*  Before the stop, officers were aware that older model Honda Accords were frequently stolen vehicles.  Franco was identified and a records check was conducted, which reflected Franco had prior felony convictions for weapons offenses and possession of stolen vehicle.  While Abel stayed with Franco, Donovan did a protective sweep of the vehicle from the outside to make sure no one else was in the car.  He observed the shaved key on the floorboard.  Donovan testified "this is your basic stolen vehicle scenario."

The VIN was obtained to determine if the vehicle was reported stolen.  While obtaining the VIN, officers observed the steering column had been tampered with and the center console was empty where the stereo should have been.  Attempts were made to identify the registered owner.

1    Checks with Nevada and California DMV were negative.  Officers checked with Arizona and

2    found the registered owner was listed as Thomas Alley.  Initial attempts to reach Alley were

3    unsuccessful.  The court finds that under the totality of the circumstances officers initially had

4    reasonable suspicion to conduct the traffic stop and developed probable cause within minutes of

5    the stop to arrest Franco for driving with fictitious plates, possession of a burglary tool (the shaved

6    key) and possession of stolen vehicle.  However, as Officer Abel testified, when Sarah came out

7    of the Wal-Mart and approached investigating officers, things changed.

8          The motion to suppress argues that although officers may have initially have had probable

9    cause to arrest Franco, they obtained information during their investigation that dissipated probable

10   cause.  The reply argues officers learned sufficient information minutes *after* Officer Hagar

11   searched the car and found the gun that dissipated any probable cause to believe that Franco had

12   committed any crime.  Specifically, the reply argues that Sarah West told officers that she was the

13   owner of the vehicle, she had proof of ownership at her residence, her father was the registered

14   owner, and she had put license plates from another vehicle on the Honda.  Additionally, Franco

15   was cooperative, truthfully identified himself, answered police questions, and police were aware

16   the owner of the car had a concealed weapons permit.  Thus, police no longer had probable cause

17   for Franco's arrest for any crime.

18         In *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005), *cert denied*, 549

19   U.S. 876 (2006), the Ninth Circuit held that "[a] person may not be arrested, or must be released

20   from arrest, if previously established probable cause has dissipated."  Police may rely on the

21   totality of facts and circumstances available to them to establish probable cause, and as a corollary

22   to this rule "they also may not disregard facts tending to dissipate probable cause."  *Id.*  Citing

23   cases from the Fifth and Seventh Circuits, *Ortiz-Hernandez* held that "[t]he continuation of even

24   a lawful arrest violates the Fourth Amendment when the police discover additional facts

25   dissipating their earlier probable cause."  *Id*.

26         The court finds that the police investigation developed facts that dissipated probable cause

27   to arrest Franco for the cold plate violation, possession of burglary tools, and possession of stolen

28   vehicle.  The CAD report reflects that police identified Thomas Alley as the registered owner at

27

10:50:38.    A request for information on a possible registered owner at an address at 1609 Cresthaven was requested at 10:53:56.  It seems clear this is the address Sarah gave officers telling them she had proof of ownership at her residence.  A subsequent entry on 10:57:46 indicates officers were en route to a possible registered owner at the 1609 Cresthaven address, that there were "priors at this res," and a citation showed "fem Sarah Alley West . . . not the ro of veh tho."  A minute later, at 10:58:47 a request was made to the Arizona Police Department to contact the registered owner of the vehicle in Chloride, Arizona, and to see if he knew where his vehicle was.

Officers asked Sarah to attempt to reach her father and a voicemail was left at the number she provided.  It is unclear exactly when officers communicated directly with Mr. Alley.  However, Officer Donovan's affidavit supporting the telephonic search warrant obtained in this case indicates contact had been made with Thomas Alley, the "title holder" on the vehicle.  The search warrant was applied for at 1:40 p.m.  Officer Donovan's application and affidavit indicates that Officer Abel contacted Mr. Alley who stated that his daughter was allowed to have the car.  It is therefore clear that probable cause to arrest Franco for the cold plate violation, possession of burglary tools, and possession of a stolen vehicle had dissipated before the search warrant was applied for at 1:40 p.m.

However, officer Hager found the bullets and firearm long before probable cause for the other three offenses dissipated.  Hagar was aware before he searched the car that a records check reflected Franco had 10 prior felony convictions, which included weapons related offenses.  As the Ninth Circuit's decision in *United States v. Lopez*, 482 F.3d 1067 (9th Cir. 2007), makes clear, in a situation in which investigating officers learn information that dissipates probable cause, the "critical question" is whether "the totality of the circumstances available to police provide probable cause" at the time the evidence was obtained.  *Id* at 1073.

In *Lopez*, the police believed they had probable cause to arrest Lopez as a principal in an attempted shooting.  Lopez was taken to the police station where he was questioned and gave written consent to search.  Lopez filed a pretrial motion to suppress arguing his Fourth and Fifth Amendments rights had been violated because the police lacked probable cause to arrest him.  The district court denied the motion.

On appeal the Ninth Circuit found that facts gathered after his initial detention "tended to dissipate, rather than support probable cause to believe Lopez was the attempted shooter" by the time he was brought to the police station, questioned, and gave written consent to search. *Id* at 1075. However, because established precedent allowed the court to affirm on any basis supported by the record, the Ninth Circuit examined the record and found the police had probable cause to arrest Lopez as an accessory to the crime. *Id* at 1076. The court found that although it was possible Lopez was an unwitting acquaintance of the shooter, and there may have been plausible, innocent explanations for Lopez's conduct, "the police were not required to believe to an absolute certainty, or by clear and convincing evidence, or by a preponderance of the evidence, that Lopez had committed a crime—what was required was a fair probability, given the totality of the circumstances." *Id.* Finding probable cause to arrest Lopez as an accessory after the fact, the court held that at the time Lopez signed the consent to search police had probable cause to arrest, albeit for a different crime than the police believed, and his consent to search was therefore voluntary. The Ninth Circuit therefore upheld the district judge's denial of Lopez's motion to suppress.

Here, the court finds that at the time the bullets and gun were discovered police still had probable cause to arrest Franco for the cold plate violation, possession of burglary tools, and possession of stolen vehicle. Probable cause for these offenses did not dissipate until police spoke with Sarah, obtained information from her, sent an officer to her residence to locate ownership paperwork, ran a records check confirming that Thomas Alley was the registered or titled owner, and spoke with Mr. Alley who confirmed that Sarah had permission to have the car. Ms. West denied knowing a gun was in the car, even after Officer Able told her that "if it was hers it's fine." Police were aware that Mr. Alley had a concealed weapons permit and asked him whether the gun found in the car was his, which he denied. Under the totality of the circumstances police had probable cause to arrest Franco for felon in possession of a firearm when the firearm and bullets were found in the Honda.

However, it is undisputed that the search of the Honda was conducted without a warrant. The critical question is whether the government has met its burden of establishing an exception to the warrant requirement authorized the search and seizure. The government claims the decision

to tow the vehicle was made shortly after the stop, and that even if Officer Hagar searched the vehicle prematurely, the firearm and other evidence would have been inevitably discovered in a lawful inventory search pursuant to LVMPD impound policy.

**IV.    The Automobile Search**

A warrantless search of a vehicle is per se unreasonable under the Fourth Amendment, subject to only a "few specifically established and well-delineated exceptions." *United States v. Cervantes*, 703 F.3d 1135, 1138–39 (9th Cir. 2012) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)); *United States v. Brown*, 563 F.3d 410, 414 (9th Cir.2009) (citing *United States v. Murphy*, 516 F.3d 1117, 1120 (9th Cir. 2008)).  The government bears the burden of establishing a warrantless search or seizure falls within one of these exceptions. *Cervantes*, 703 F.3d at 1141.

In *Carroll v. United States*, 267 U.S. 132 (1925), the Supreme Court held that the Fourth Amendment does not require a search warrant to search an automobile if the officers have probable cause to believe the vehicle contains contraband. *Id*. at 153–162.  The rationale for the automobile exception to the search warrant requirement is based on the inherent mobility of vehicles, and the recognition that individuals have a reduced expectation of privacy in their automobiles. *See, e.g.*, *United States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012) (stating "the automobile exception is justified by the exigency created by the inherent mobility of vehicles as well as the relatively minimal expectation of privacy that exists with respect to automobiles").  The automobile exception to the search warrant requirement applies whether or not the car's owner or driver has already been taken into custody or the risk of the inherent mobility of the automobile has been eliminated. *Id.*  As long as police have probable cause to believe that the vehicle contains evidence of a crime, the automobile exception to the warrant applies. *Id.* (citing *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010)).  The probable cause determination is based on a totality of the circumstances. *Id.*

Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances." *Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  Probable cause is "a fluid concept-turning on the assessment of probabilities in particular

factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S at 232.  Probable cause does not deal with hard certainties, but with probabilities.  *Id.* at 241.

The government does not claim that police had probable cause to search the vehicle under the automobile exception to the warrant requirement.  Rather, the government maintains that the police had probable cause to arrest Franco, and because officers decided to impound the vehicle within minutes of the stop, the firearm would have inevitably been discovered pursuant to standard LVMPD policy during a lawful inventory search.

## V.     Impound or Inventory Searches

The government contends that the search was a lawfully conducted inventory search pursuant to LVMPD impound policy because ownership and rightful possession of the vehicle was in doubt, and because the vehicle could not be lawfully driven without valid registration and license plates.  If the court finds Officer Hagar "jumped the gun" and searched the car prematurely, the government's fallback position is the firearm and other evidence would eventually have been inevitably discovered in an inventory search because the decision to tow the vehicle was made shortly after the stop, and the impound was authorized by department policy.  Franco argues that the impoundment of the car was not justified by any of the 12 reasons stated in LVMPD's policy manual, nor under the community caretaking doctrine.

The impoundment of a vehicle is a seizure within the meaning of the Fourth Amendment. *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005).  The government has the burden of justifying a vehicle impoundment under one of the exceptions to the warrant requirement.  *Id.* Inventory searches have been held constitutional if they are conducted in accordance with the standard procedures of the agency conducting the search or come under another exception to the Fourth Amendment warrant requirement.  *United States v. Ramos-Oseguera*, 120 F.3d 1028, 1036 (9th Cir. 1997), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000).  Inventory procedures protect an owner's property while it is in the custody of the police, ensure against claims of lost, stolen, or vandalized property, and guard the police from danger. *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987).  The Supreme Court has held that standardized criteria or established routine must regulate opening containers found during inventory searches

so that an inventory search is not used as a pretext for general rummaging to discover incriminating evidence. *Florida v. Wells*, 495 U.S. 1, 4 (1990). The policy or practice of a law enforcement agency governing inventory should be designed to produce an inventory; the individual police officer must not be allowed so much discretion that an inventory search becomes a "purposeful and general means of discovering evidence of a crime." *Id.*

The Ninth Circuit has also recognized that an impoundment may be proper under the community caretaking doctrine if the driver's violation of a vehicle regulation prevents the driver from lawfully operating the vehicle, and it is necessary to remove the vehicle from an exposed or public location. *See Cornelius*, 429 F.3d at 865 (citing *United States v. Gutierrez*, 995 F.2d 169, 171 (9th Cir. 1993) (both cases finding where defendant had no valid driver's license, he could not drive his vehicle away). However, a decision to impound a vehicle that is not consistent with the police's role as "caretaker of the streets" may be unreasonable. *Id.* The Ninth Circuit has found that in determining whether to impound a vehicle after a driver has violated a vehicle regulation, a police officer must consider the location of the vehicle and whether the vehicle was actually "impeding traffic or threatening public safety and convenience" on the streets such that impoundment was warranted. *Id.* (citing *South Dakota v. Opperman*, 428 U.S. 364, 371 (1976)). An officer cannot reasonably order an impoundment in situations where the location of the vehicle does not create any need for the police to protect the vehicle or to avoid a hazard to other drivers. *Id.* (internal citation omitted).

The court finds the impound was clearly not justified under the community caretaking doctrine as the Honda was parked in a private parking lot, and the officers testified it was not impeding traffic or threatening public safety. There is no testimony in the record that would support a finding that the officers had a reasonable belief the vehicle would be stolen or vandalized if it was left where it was parked. In *Cornelius*, the Ninth Circuit found that the need to deter a driver's unlawful conduct was insufficient, of itself, to justify a tow under the caretaker rationale. *Id.* at 866. Therefore, the government bears the burden of establishing that the search of the vehicle was a lawful inventory search conducted in accordance with LVMPD policies and procedures for impoundment.

1    Both Donovan and Abel testified that the decision to tow the vehicle was made shortly

2  after the stop.  Both testified to various reasons supporting the decision to tow.  They testified that

3  a tow was justified under department policy because ownership and rightful possession was in

4  doubt, and because the vehicle was cold plated, not registered, and could not be lawfully operated.

5  Abel at first did not recall that he was the officer who filled out the impound report.  He was shown

6  the report, and it was pointed out that he had not filled in the section identifying the reason for the

7  impound.  He then testified this was an oversight, and that if he had filled in this section of the

8  form he would have written that the reason was because the driver was arrested.  The government

9  does not claim in in its opposition to the motion to suppress that the impound was authorized

10  because of Franco's arrest.

11    The government argues that the impoundment was justified by 2 of the 12 circumstances

12  LVMPD policy authorizes for impoundment.  First, the government relies on LVMPD policy

13  5/204.06(6), which authorizes an impoundment when ownership and rightful possession by the

14  driver is in doubt.  The court disagrees.  For the reasons explained earlier in this report and

15  recommendation, probable cause to believe the vehicle was stolen, or that Franco was responsible

16  for the fictitious plates, or in possession of burglary tools, had dissipated before the telephonic

17  search warrant was applied for at 1:40 p.m.  The tow was not requested until 2:19 p.m., presumably

18  because officers were preparing and obtaining the search warrant before physically recovering

19  evidence from the vehicle.  Before the tow was requested officers could no longer rely on "doubt

20  about the ownership or rightful possession" of the Honda to justify its impoundment.

21    Donovan's application and affidavit supporting the state telephonic search warrant states

22  that because of the suspicious nature of the "vehicle status," the fact that Franco had a shaved key,

23  and that he was a 10-time convicted felon, "the vehicle was going to be towed for safekeeping and

24  an inventory was begun by Officer Hager" who "located a small bag that contained a small amount

25  of pistol ammunition in the passenger side floorboard and a firearm, holstered, inside an open

26  compartment where the stereo should be."  The record does not support a finding that Hager was

27  conducting an inventory search at the time he found the bullets in a Crown Royal bag on the

28  / / /

33

1    floorboard on the passenger side or the gun in the center console.  In Hagar's own words he was

2    "just searching."

3         Officer Hager arrived a few minutes after Donovan and Abel made the initial stop.  Franco

4    told officers he had given his friend Sarah a ride to the Wal-Mart, she was the owner of the vehicle,

5    and she was in the store.  Hager entered the vehicle, initially on the passenger side wondering out

6    loud on the video whether any paperwork belonging to the vehicle was inside.  There is no

7    testimony he went into the glove box or any other area where registration or other proof of

8    ownership might be found.  Rather, as he admitted during the evidentiary hearing, he saw a purple

9    Crown Royal bag on the floorboard, opened it, found bullets and immediately asked Franco where

10   the gun was.  He acknowledged that he was not looking for vehicle paperwork when he opened

11   the bag, but was "just searching."  A few moments later he walked around to the driver's side, slid

12   the front seat forward and found the gun in the empty center console area.  Dispatch was advised

13   at 10:48:58, approximately 10 minutes after the initial stop, that the gun was found in the center

14   console area.  This initial search, and discovery of the bullets and gun occurred before Sarah came

15   out of the Wal-Mart and made contact with officers.  The bullets and gun were also found before

16   Thomas Alley was identified as the registered owner at 10:50:38.

17        However, a tow was not requested until 2:19 p.m., hours after officers learned that the

18   registered owner was Thomas Alley.  As Officer Donovan's affidavit and search warrant

19   application makes clear, sometime before 1:40 p.m. when the search warrant was requested,

20   Officer Abel had spoken to Mr. Alley who confirmed that the vehicle was his and that Sarah had

21   permission to have it. The search warrant application represented to Judge Tobiasson that Alley

22   was the title owner of the vehicle.  Thus, by the time the tow was requested and the impound report

23   was filled out, officers no longer had a reasonable belief that the vehicle was stolen or reasonable

24   doubt about ownership and rightful possession by the driver.

25        The government also relies on LVMPD policy 5/204.6(10), which authorizes vehicle

26   impound "in other circumstances, in accordance with the prescribed authority and conditions

27   defined in the Las Vegas City Code, Clark County Ordinances, and Nevada Revised Statutes."

28   The court finds the impound was authorized by this policy provision.  It is undisputed that the

34

vehicle was not registered and was displaying plates that did not belong to it. Sarah admitted putting plates on the Honda from another vehicle. She told officers at the scene that she put the plates on the vehicle because she did not have money to register it and did not want to be stopped by the police. She also testified at the evidentiary hearing that the car was hers, although it was in her father's name so that her husband would not get the car in their divorce, and that she was the one who put the plates from another vehicle on the car. It is unlawful under NRS 482.545 to operate a vehicle that is not registered or does not have current license plates assigned to it by the Department of Motor Vehicles. Because it was unlawful to drive the vehicle away from the parking lot, this policy provision authorized impound of the vehicle. The LVMPD policy requires officers to "thoroughly search vehicles and containers located therein" and to inventory personal property on a vehicle impound report. Thus, although Hagar was clearly not performing an inventory search when he discovered the bullets and firearm, LVMPD authorized the impound and required impounding officers to "thoroughly search vehicles and containers" located in the vehicle and to inventory personal property on a vehicle impound report. The court therefore finds that the evidence Franco seeks to suppress would inevitably have been discovered in accordance with standard department policies and procedures.

"The inevitable discovery doctrine is an exception to the exclusionary rule." *United States v. Ruckes*, 586 F 3d 713, 718 (9th Cir. 2009) (quoting *United States v. Andrade*, 784 F 2d. 1431, 1433 (9th Cir 1986)). It permits the government to rely on evidence that ultimately would have been discovered in the absence of a constitutional violation. *Nix. v. Williams*, 467 U.S. 431, 443 (1984). In *Nix*, the Supreme Court explained that if the prosecution establishes by a preponderance of the evidence that the information or evidence "ultimately or inevitably would have been discovered by lawful means" the evidence should be admitted because the deterrence rationale for the exclusionary rule "has so little basis." *Id*. at 444. The court finds the government has met its burden of establishing that the firearm and bullets would ultimately and inevitably have been discovered in an inventory search conducted pursuant to LVMPD policy to impound a vehicle when it cannot be lawfully operated with current registration and license plates assigned to it by the Nevada Department of Motor Vehicles as required by NRS. 482.545.

1

## <u>CONCLUSION</u>

2    Having reviewed and considered the matter, and for the reasons explained at length,

3    **IT IS RECOMMENDED** that Franco's Motion to Suppress Evidence (ECF No. 23) be

4 **DENIED**.

5    DATED this 31st day of March, 2017.

6

7

8    PEGGY A. LEEN
     UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28